**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ERIC D. HOVDE AND STEVEN D. HOVDE,** | |
| **Plaintiffs,** | **Case No.: 24-cv-00638** |
| **v.** | |
| **RAINER HUMMEL** | |
| **Defendant.** | |

**COMPLAINT**

Plaintiffs Eric D. Hovde and Steven D. Hovde (the "Hovdes"), by and through their attorneys, MILLER, CANFIELD, PADDOCK & STONE, P.L.C., for their Complaint against Defendant Rainer Hummel ("Hummel"), states as follows:

**PARTIES, VENUE, AND JURISDICTION**

    **A.**    **Plaintiffs Eric D. Hovde and Steven D. Hovde**

    1.    Eric D. Hovde, an individual, is a citizen of the State of Wisconsin.

    2.    Steven D. Hovde, an individual, is a citizen of the State of Colorado.

    3.    The Hovdes, amongst other things, are in the business of purchasing, developing, managing, and financing real estate throughout the country and abroad.

    **B.**    **Defendant Rainer Hummel**

    4.    Hummel, an individual, is a citizen of the city of Niagara-on-the-Lake, Ontario, Canada.

    5.    Hummel, among other things, is a commercial real estate developer.

    6.    Hummel is the beneficial owner of Norway Capital Corporation ("Norway Capital").

C. **Jurisdiction and Venue**

7.      Pursuant to 28 U.S.C. §1332(a)(2), subject matter jurisdiction is proper because the Hovdes seek damages in excess of $75,000.00 from Hummel, and the parties are completely diverse.

8.      Venue is proper in the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. §1391(b)(2), because a substantial portion of the events underlying this action took place within the Northern District of Illinois, and all but one of the various agreements that Hummel tortiously interfered with specified Illinois as the proper venue.

## ALLEGATIONS

I.      **THE HOVDES ENTER INTO AGREEMENTS REGARDING THE REAL ESTATE.**

9.      On June 2, 2005, the Hovdes entered into several agreements with Isla Development, LLC ("Isla USA"), Isla Development México, Sociedad Anonima de Responsabilidad Limitada ("Isla Mexico"), JJBA Holdings, LLC ("JJBA") (collectively the "Isla Parties"), and Jeffrey T. Riegel ("Riegel").

10.      These agreements are all connected to several loans that the Hovdes made to the Isla Parties and Riegel to enable them to develop a real estate project on Isla Mujeres, a Caribbean Island off the coast of Cancun, México (the "Isla Mujeres Project").

A.      **The Loan & Security Agreement**

11.      First, the Hovdes entered into a loan and security agreement (the "Loan & Security Agreement") with Isla USA.  *See* Exhibit 1, Loan & Security Agreement.

12.      Isla USA is solely owned by Riegel.

13.     Under the Loan & Security Agreement, the Hovdes agreed to loan up to $2,500,000.00 in exchange for repayment with interest, the grant of a security interest, and compliance with other enumerated conditions. *Id.* at § (2).

14.     One of the enumerated conditions was that the Loan "shall bear interest" in accordance with the terms of the Loan & Security Agreement. *Id.* at § (3).

15.     The Loan & Security Agreement also specified that an Event of Default occurred when there was a "failure of the Borrower [referring to Isla USA] to make any payment of any installment of principal or interest when due under the Note." *Id.* at § (10)(a).

16.     If an Event of Default occurred, the Hovdes had the right to "[d]eclare immediately due and payable the outstanding principal balance of the Note, together with all accrued and unpaid interest, fees and other sums or expenses payable thereunder and hereunder and accordingly accelerate payment." *Id.* at § (11)(a)(i).

17.     Further, the Loan & Security Agreement specified that "any legal suit, action or proceeding against Borrower [referring to Isla USA] or Lender [referring to the Hovdes] arising out of or relating to this Note or the other Loan Documents shall be instituted in any federal or state court in Illinois." Ex. 1, at § (19)(b) (capitalization convention omitted).

### B.     The Mortgage Note & Guaranty

18.     Second, the Hovdes also executed a mortgage note & guaranty agreement (the "Mortgage Note & Guaranty") with Isla USA. *See* Exhibit 2, Mortgage Note & Guaranty.

19.     The Mortgage Note & Guaranty obligated Isla USA to pay "twenty percent of the 'Net Profits' from the sale of Lots or Units on the Mortgaged Property" along with the principal and any interest due under the Loan & Security Agreement. *Id.* at 3.

20.     The same Mortgage Note & Guaranty specified that it was secured by a mortgage "given by Borrower's [referring to Isla USA] subsidiary, Isla Development Mexico, S. de R.L. de C.V." *Id.*

21.     Similarly, the Mortgage Note & Guaranty also defined an Event of Default, with a comparable acceleration provision, as occurring if Isla USA, "fail[ed] to make when due, whether by acceleration or otherwise, any payment of principal of, or interest on, this Note or any fee or other amount required to be made to the Lender [referring to the Hovdes] pursuant to the Loan Documents." *Id.* at 3, § (a).

22.     The Mortgage Note & Guaranty stated that "[t]his Note is being delivered in, and shall be governed by the laws of, the State of Illinois." *Id.* at 12.

**C.     The Mortgage Agreement**

23.     Third, Isla Mexico granted the Hovdes a mortgage over the two parcels of property in the Isla Mujeres Project (the "Mortgage Agreement"). *See* Exhibit 3, Mortgage Agreement in Spanish, and English.[1]

24.     Isla Mexico, a Mexican sociedad de responsabilidad limitada (*i.e.*, a limited liability company), is wholly owned by Isla USA and JJBA.

25.     Isla USA owns 99.97% of Isla Mexico, and JJBA owns 0.03% of Isla Mexico.

26.     JJBA is wholly owned by Isla USA.

27.     The Mortgage Agreement was originally executed in Spanish, but subsequently was translated to English.

---

[1] The English translation was provided by Isla USA, Riegel, Isla Mexico, and JJBA in separate litigation. Although not prepared by the Hovdes themselves, they currently have no reason to doubt that this translation is accurate.

28. At the time the Mortgage Agreement was executed, the real property being developed in the Isla Mujeres Project was valued at $8,455,600.00 (the "Real Property"). *Id*. at 2.

29. Under the Mortgage Agreement, Isla Mexico purchased the Real Property from "the commercial company named Foturin" for $1,475,000.00. *Id.* at 4-5.

30. The Mortgage Agreement went on to specify that it created a mortgage in favor of the Hovdes to ensure "the payment of the principal, interest, late charges, professional fees, origination expenses, registry, insurance, taxes, and execution, as well as any other amounts related with the credit contract or this mortgage." *Id.* at 6.

31. The Mortgage Agreement also specified that "the mortgage constituted by this present document is irrevocable and will remain in force until the date in which all the mortgaged obligations have been completely fulfilled, and any debt in favor of the mortgage creditors, as well as the mortgaged guarantees then due have been fully paid." Ex. 3, at 12.

**D.** **The Unit Pledge Agreement**

32. Fourth, the Hovdes executed an agreement with Isla USA, JJBA, and Riegel to grant the Hovdes a contingent ownership interest in several of the companies connected with these transactions (the "Unit Pledge Agreement"). *See* Exhibit 4, Unit Pledge Agreement.

33. Under the Unit Pledge Agreement, Isla USA, JJBA, and Riegel agreed to further secure the loan by granting the Hovdes a security interest over the entire ownership stake of Isla Mexico, Isla USA, and JJBA. *Id.* at § (1).

34. If an Event of Default occurred, as defined by the Loan & Security Agreement or the Mortgage Note & Guaranty, the Hovdes had the right to cause the ownership of Isla Mexico, Isla USA, and JJBA "to be transferred of record into the name of the Lenders [referring to the Hovdes] or their nominee." *Id.* at § (3)(d)(ii).

5

35.     The Unit Pledge Agreement specified that any lawsuit "relating to this Pledge Agreement or the other loan documents shall be instituted in any federal or state court in Illinois, or with respect to the pledge in the Mexican Interest, before a federal or local judge with jurisdiction in Isla Mujeres, Quintana Roo, Mexico." *Id.* at §(8).

### E.     **The Continuing Unconditional Guaranty**

36.     The last agreement that the Hovdes executed was a guaranty with Riegel himself (the "Continuing Unconditional Guaranty"). *See* Exhibit 5, Continuing Unconditional Guaranty.

37.     In the Continuing Unconditional Guaranty, Riegel guaranteed "the prompt, full and faithful performance and discharge by Borrower of each and every term, condition, agreement, representation and warranty now or hereafter made by Borrower to Lenders pursuant to the Loan Documents (all such indebtedness, liabilities and obligations being hereinafter referred to as the 'Borrower's Liabilities')." Ex. 5, at 1.

38.     Riegel also personally guaranteed "to pay all costs and expenses, including, without limitation, all court costs and reasonable attorneys' and paralegals' fees paid or incurred by Lenders in endeavoring to collect all or any part of Borrower's Liabilities, or in enforcing its rights in connection with any collateral pledged to secure Borrower's Liabilities." *Id*.

39.     Riegel also covenanted that the "guaranty shall be governed and controlled by the internal laws of the State of Illinois" and that "subject to Lender's sole and absolute election, all actions or proceedings in any way, manner or respect, arising out of or from or related to this Guaranty shall be litigated in courts having situs within the City of Chicago, State of Illinois." *Id.* at 5-6 (capitalization convention omitted).

**F.**     **The Amendments and Forbearance Agreement**

40.     At the time, the Loan & Security Agreement, the Mortgage Note & Guaranty, the Mortgage Agreement, the Unit Pledge Agreement, and Continuing Unconditional Guaranty (the "Initial Agreements") set forth all the agreements between the Hovdes and the Isla Parties & Riegel. Consistent with the terms outlined above, the total amount available on the loan was $2,500,000.00. Immediately, the Isla Parties and Riegel drew on the available funds and the Hovdes gave them $1,585,592.00.

41.     However, shortly thereafter, the Isla Parties and Riegel realized that they would need additional funds to complete the closing and obtain title insurance for the Isla Mujeres Project. Consequently, the Loan & Security Agreement, along with the Mortgage Note & Guaranty were amended to loan Isla USA and Riegel an additional $404,229.00. Exhibit 6, First Amendment to the Loan & Security Agreement, at 1; Exhibit 7, First Amendment to the Mortgage Note & Agreement.

42.     Then, the Isla Parties and Riegel realized that they would need an additional $500,000.00 to finish construction at the Isla Mujeres Project. Thus, they came back to the Hovdes and asked for more money. The Hovdes obliged.

43.     Consequently, the Loan & Security Agreement along with the Mortgage Note & Guaranty were amended again to loan the Isla Parties and Riegel an additional $500,000.00. Exhibit 8, Second Amendment to the Loan & Security Agreement, at 1; Exhibit 9, Second Amendment to the Mortgage Note & Guaranty, at 1.

44.     At this point, the Isla Parties and Riegel owed the Hovdes approximately $2,489,821.00 in total principal out of the $2,500,000.00 available to them. However, the Isla Parties and Riegel again needed more money. So, they covenanted with the Hovdes to extend the

total amount available to loan by an additional $1,500,000.00. Exhibit 10, Third Amendment to the Loan & Security Agreement, at 1; Exhibit 11, Third Amendment to the Mortgage Note & Guaranty, at 1.

45. The Isla Parties and Riegel drew on those new available funds. As of February 21, 2008, the Isla Parties and Riegel owed the Hovdes a total principal balance (not including interest) of approximately $3,989,821.00. Exhibit 12, Fourth Amendment to the Loan & Security Agreement, at 1; Exhibit 13, Fourth Amendment to the Mortgage Note & Guaranty, at 1.

46. By this time, the Isla Parties and Riegel were having financial difficulty. Consequently, the Isla Parties and Riegel were unable to immediately repay the money that they loaned from the Hovdes. The Hovdes, wanting to help, entered into an agreement to forebear exercising any of their remedies available under the Initial Agreements (the "Forbearance Agreement") and stating that Isla Parties and Riegel owed the Hovdes $4,417,321.30 in total principal due. Exhibit 14, Forbearance Agreement.

47. Together, the Initial Agreements, all the Amendments, and the Forbearance Agreement constituted all the agreements between the Hovdes and the Isla Parties along with Riegel (the "Loan Agreements").

48. The Forbearance Agreement was set to expire on December 31, 2008.

49. By December 31, 2008, the Isla Parties had not paid the Hovdes a single dollar due under the Loan Agreements, and thus defaulted on their obligations under the Loan Agreements. Accordingly, the Hovdes began their legal efforts to recover the money due to them.

## II.    THE ISLA PARTIES AND THE HOVDES PROCEED TO LITIGATION.

50. In 2011, the Hovdes filed an action, in Mexico, to foreclose on the Real Property secured by the Mortgage Agreement.

8

51.     For years, the Hovdes have litigated that case on the merits (the "Mexican Mortgage Foreclosure Action").  The Mexican Mortgage Foreclosure Action was initially brought solely against Isla Mexico, but eventually included additional parties.

52.     Isla Mexico retained counsel, in Mexico, to defend the Mexican Mortgage Foreclosure Action.  Isla Mexico's counsel is Isaac Zatarain Valenzuela of TP Legal, S.C.

53.     Isla Mexico's decision to pay and retain counsel surprised the Hovdes given the fact that the Isla Parties never paid a dollar due under the Loan Agreements.

54.     During the pendency of that litigation, the Hovdes learned that the Isla Parties and Riegel purported to grant a mortgage in the Real Property to Norway Capital.  At the time, the Hovdes did not know anything about Norway Capital other than that it purported to hold title to the Real Property.  Furthermore, information regarding any parties' ownership interest in Norway Capital was not and is not available through public records.

55.     In 2021, the Hovdes initiated a fraudulent conveyance proceeding in Mexico to unwind the transaction between the Isla Parties, Riegel, Scotiabank, and Norway Capital (the "Mexican Fraudulent Conveyance Action").  The procedural posture of the Mexican Fraudulent Conveyance Action has resulted in at least one of the defendants being served this year.  The action remains pending in Mexico to this date.

56.     In the United States, and in 2018, the Hovdes initiated an action for breach of the Mortgage Note & Guaranty and Continuing Unconditional Guaranty (the "Breach of Contract Action").  The Breach of Contract Action was brought in the Northern District of Illinois, and sought recovery of damages that the Hovdes incurred as a result of Isla USA, JJBA, and Riegel's breaches.

9

57.     Isla USA, JJBA, and Riegel opposed the Breach of Contract Action, and argued that the statute of limitations had run on the Hovdes' opportunity to collect on the Mortgage Agreement.

58.     Despite their alleged insolvency, and again at great surprise to the Hovdes, Isla USA, JJBA, and Riegel retained Gregory J. Jordan and Mark R. Zito, of Jordan & Zito LLC, to defend the Breach of Contract Action.

59.     Jordan & Zito LLC is a limited liability company organized under the law of the State of Illinois.  Both Mark R. Zito, and Gregory J. Jordan are attorneys licensed to practice in the State of Illinois.

60.     Also, in 2018, the Hovdes initiated a Uniform Commercial Code Sale of the shares collateralized by the Unit Pledge Agreement (the "Personal Property").  To that end, Isla USA, JJBA, and Riegel filed a separate lawsuit to enjoin that sale (the "UCC Action").  This action was filed in the Northern District of Illinois, by Jordan & Zito LLC, on behalf of Isla USA, JJBA, and Riegel.  The UCC Action remains pending to this date.

## III.     THE HOVDES LEARN ABOUT HUMMEL'S TORTIOUS ACTIONS.

61.     For years, the Isla Parties and Riegel maintained that they were insolvent which was the cause of the Event of Default that started the underlying litigation.  However, the Hovdes remained ignorant as to how supposedly insolvent companies could finance several lawsuits in two different countries.

62.     On July 10, 2019, the Hovdes learned the answer based on the deposition testimony of Riegel given in connection with the Breach of Contract Action.  *See* Exhibit 15, Jeffrey Riegel Deposition Transcript.

63. Riegel admitted in a deposition that he had formed a "loose partnership" with Hummel. *Id.* at 181:9-10.

64. In connection with that "loose partnership," Hummel potentially paid more than a million dollars to finance the litigation in the United States and Mexico. *Id.* at 184:15-19.

65. For example, in connection with the Mexican Mortgage Foreclosure Action alone, Hummel paid "500,000 to a million dollars" for Isla Mexico's legal defense. *Id.*

66. As of the date of deposition (*i.e.*, July 10, 2019), Hummel had also paid $30,000.00 to $40,000.00 in legal fees in connection with the Breach of Contract Action. *Id.* at 188:7-8.

67. Hummel knew that the cost of a legal defense was substantially less than the total value of the Real Property.

68. So, Hummel saw an opportunity to obtain the Real Property cheaply. He would pay the Isla Parties legal fees, and they would grant him title to the Real Property.

69. Hummel knew that the Hovdes held a valid security interest in the Real Property and Personal Property as evidenced by various agreements. But regardless, Hummel agreed to pay for the legal defense of the Isla Parties to induce them to breach their obligations to the Hovdes.

70. In exchange for the legal defense, the Isla Parties agreed to grant Hummel four mortgages over the Real Property. Ex. 16, at 171:9-179:4.

71. Indeed, Riegel admitted that Hummel paid these legal fees and costs in an attempt to "more or less" obtain title to the Real Property, and "protect his investment by funding the defense of Isla Mexico in the Mexican foreclosure." *Id.* at 187:4-6.

72. Riegel also admitted that Hummel has been funding this litigation, since at least 2011, which was well before the statute of limitations could have run on a Breach of Contract Action. *Id.* at 187:7-10.

73.     Thus, there was a *quid pro quo* agreement by which Hummel provided financial inducement, in the form of paid legal fees and likely other incentives, to induce the Isla Parties to breach their contractual obligations to the Hovdes, and give Hummel the Real Property instead.

74.     Hummel did not want the Hovdes to discover his scheme to steal the Real Property. Thus, Hummel took steps to conceal his identity from the Hovdes.

75.     To this end, Hummel executed the mortgage transaction through his shell company, Norway Capital.

76.     On or about December 16, 2016, and before the statute of limitations could have run on the Breach of Contract Action, Isla Mexico purported to transfer title of the Real Property to Norway Capital outright.

77.     Norway Capital is a Canadian corporation.  In Canada, the identities of the beneficial owners of a private corporation are not publicly available information.

78.     Accordingly, the Hovdes had no reasonable way of knowing that Norway Capital was actually a shell corporation for Hummel himself until July 10, 2019, when Riegel admitted it in his deposition.

79.     Consequently, when Isla Mexico purported to transfer the Real Property to Norway Capital, the Hovdes did not know that Isla Mexico was actually transferring the property to Hummel himself.

80.     Hummel used his shell company, Norway Capital, to intentionally prevent the Hovdes from learning his identity.

81.     Hummel has continued to pay for the Isla Parties' legal fees and costs to "protect his investment" to this date.  *Id.* at 187:4-6.  Hummel continues to direct payments into the State of Illinois and to avail himself of Illinois law.

82. If Hummel's litigation efforts are successful, the Isla Parties will grant him title to the Real Property despite their obligations to the Hovdes.

## IV. HUMMEL'S TORTIOUS ACTIONS HARM THE HOVDES.

83. In 2019, the district court ruled in favor of Isla USA, JJBA, and Riegel, holding that the statute of limitations had run on the Breach of Contract Action. The Hovdes appealed that decision to the Court of Appeals for the Seventh Circuit. The Seventh Circuit affirmed the judgment entered below.

84. Hummel financed the Breach of Contract Action through the district court's entry of judgment, and through the Seventh Circuit Court of Appeals' decision.

85. Isla USA, JJBA, and Riegel would not have been able to defend this action, nor the appeal, without the funding from Hummel as they are insolvent.

86. Therefore, the difference between the Hovdes being able to recover damages in the Breach of Contract Action, and not, was the legal strategy concocted by and paid for by Hummel.

87. The Hovdes have now been deprived of the opportunity to collect the principal balance due under the Loan & Security Agreement, the Mortgage Note & Guaranty, the Unit Pledge Agreement, and the Continuing Unconditional Guaranty, the interest due under those agreements, and have suffered millions of dollars in legal fees in attempting to enforce their contractual rights.

88. Additionally, the UCC Action, the Mexican Fraudulent Conveyance Action, and the Mexican Mortgage Foreclosure Action are all still pending, and Hummel is still paying for those legal fees and likely providing other incentives to the Isla Parties. Consequently, Hummel continues to interfere with the Hovdes contractual rights, and force the Hovdes to incur more legal fees.

## COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT

89.     The Hovdes restate and reallege the allegations, contained within paragraphs 1 through 88, as if fully stated herein.

90.     The Loan Agreements were and are valid agreements between the Hovdes and the Isla Parties and Riegel.

91.     Hummel is not a party to any of the Loan Agreements.  These agreements are between the Hovdes and third parties to this lawsuit.

92.     In approximately 2011, Hummel began his interference to prevent the Hovdes from collecting on the enforceable Loan Agreements, by financing the Isla Parties' fees and costs, as well as likely providing them with additional incentives.

93.     Hummel was aware of the Loan Agreements because he paid attorneys, and helped devise a legal strategy to prevent the Hovdes from enforcing the Loan Agreements.

94.      Hummel intended to induce a breach of the Loan Agreements when he paid the Isla Parties' legal fees to defend the Breach of Contract Action, the Mexican Mortgage Foreclosure Action, and the UCC Action.

95.     The goal of Hummel's financial inducement was ultimately to obtain the Real Property for himself.

96.     The act of trying to obtain title to the Real Property, through the sham transaction with Norway Capital, was an unlawful act because it was prohibited by the Loan Agreements. Hummel was aware that this act was unlawful because he was aware of the Loan Agreements and their terms.

97.    Hummel also intended to induce a continuing breach of the Loan Agreements when he paid the Isla Parties' legal fees to defend the Breach of Contract Action, the Mexican Mortgage Foreclosure Action, and the UCC Action.

98.    This financial inducement was an unjustified payment because it was provided to prevent the Hovdes from obtaining the Real Property and Personal Property at issue, despite the fact that they had a legal right to that property.

99.    Hummel unjustifiably provided this financial inducement to obtain the Real Property and Personal Property for himself, despite knowing that the Hovdes were entitled to obtain that property.

100.    Upon information and belief, Hummel coerced Riegel into this agreement in order to unjustifiably obtain the Real Property for himself.

101.    On July 10, 2019, the Hovdes learned of this unjustified and intentional financial inducement at Riegel's deposition.

102.    But for Hummel's financial inducement, the Isla Parties would not have successfully been able to, nor continue to be able to, avoid the Hovdes' attempts to exercise the remedies available under the Loan Agreements.

103.    But for Hummel's financial inducement, the Isla Parties, being insolvent, would not have been able to pay attorneys, located in Illinois and in Mexico, to help defend themselves against the Mexican Mortgage Foreclosure Action and Breach of Contract Action.

104.    But for Hummel's financial inducement, the Isla Parties, being insolvent, would not have been able to pay attorneys, located in Illinois, to help initiate and prosecute the UCC Action.

105.     But for Hummel's financial inducement, Isla USA, JJBA, and Riegel, would have been unable to pay for a legal defense, and thus, would have defaulted on the Breach of Contract Action allowing the Hovdes to prevail.

106.     If Isla USA, JJBA, and Riegel, did not have Hummel's financial backing, then they would have been unsuccessful on the merits of the Breach of Contract Action.

107.     But for Hummel's financial inducement, a judgment in the Breach of Contract Action would have included an amount to account for the principal balance of $4,417,321.30.

108.     But for Hummel's financial inducement, a judgment in the Breach of Contract Action would have included an amount to account for all interest that accrues against the unpaid principal balance of the loan.  Ex. 2, at 1.

109.     The principal balance has been accruing interest since the amounts under the Loan Agreements became due.

110.     As a consequence of Hummel's tortious interference, the Hovdes have also incurred millions of dollars in attorneys' fees.

111.     Hummel is responsible for the principal balance, the interest due, and the attorneys' fees as a result of his tortious interference.

112.     For the preceding reasons set forth in this Complaint, Hummel's conduct rises to the level of willful and wanton conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Eric D. Hovde and Steven D. Hovde respectfully request that this Court enter an order, against Defendant Rainer Hummel, granting them:

(a)     a judgment no less than the principal balance remaining on the Loan Agreements, the total interest due under those agreements, and the Hovdes' attorneys fees'

16

incurred in defending and prosecuting the other actions;

(b)     an award of their attorneys' fees in initiating and prosecuting this lawsuit, due to

Hummel's malice and his scheme to tortiously interfere with the Hovdes' contracts,

which are therefore recoverable under Illinois law;

(c)     an award of punitive damages due to Hummel's willful and wanton conduct; and

(d)     any other relief that this Court deems just and proper.

ERIC D. HOVDE and STEVEN D. HOVDE

Respectfully submitted,

By:____/s Carson P. Veach_____
Carson P. Veach
Miller, Canfield, Paddock & Stone, P.L.C.
227 West Monroe Street, Suite 3600
Chicago IL 60606
(312) 460-4200
Dated: January 24, 2024          veach@millercanfield.com